UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    10-cr-351(DLI)

    -against-

HUGH GOODMAN,

          Defendant.

------------------------------x

SENTENCING MEMORANDUM

DAVID L. LEWIS, ESQUIRE
LEWIS & FIORE, ESQS.
Attorney for Defendant
HUGH GOODMAN
225 Broadway, Suite 3300
New York, New York 10007
(212) 285-2290

**LEWIS & FIORE**
**225 BROADWAY, SUITE 3300**
**NEW YORK, NEW YORK 10007**
**(212) 285-2290**
**(212) 964-4506 (FAX)**

**David L. Lewis**
**Charles G. Fiore**

May 10, 2013

**FILED ECF**

Honorable Dora L. Irizarry
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

> **RE:   United States of America v.**
> **Hugh Goodman**
> **Docket No. 10-351 (DLI)**

Dear Judge Irizarry,

I write with regard to the difficult task of sentencing Hugh Goodman who appears before you on May 20, 2013 to be sentenced. Mr. Goodman has been at liberty in the community from the day of his arrest and release on bail until today.

As detailed in our letter to the Court of April 10, 2013, the defendant has no objection to the Pre-Sentence Report (PSR) or the Guideline calculations. However, the defense strongly disagrees with the recommendation that Mr. Goodman be incarcerated for thirty months (2-1/2 years). The recommendation failed to consider a number of key sentencing factors relevant to the goals of sentencing, including key elements of Mr. Goodman's history and characteristics. Probation, and thus the recommendation, see not a single factor that would warrant a sentence outside the Guidelines (PSR 64). The recommendation was made on January 31, 2013. The 5K1 letter is dated and filed April 9, 2013. The recommendation, therefore, could not have included the details contained in the 5K1 letter, given that the crucial evaluative elements were not in the PSR, thus casting doubt on the basis and utility of the recommendation.

Honorable Dora L. Irizarry
May 10, 2013
Page 2 of 46

We respectfully request, despite the fact that the PSR recommends a sentence of two and a half years, the Court sentence Mr. Goodman to a maximum term of probation and a substantial amount of community service together would constitute a sufficient sentence that is "not greater than necessary" and would meet all of the requirements of 18 U.S.C. §3553(a).[1]  In light of the recommendation of a two and one-half year sentence, and its absence of investigation and assessment of Mr. Goodman under the requirements of 18 U.S.C. §3553(a), it falls to the defense to demonstrate all the rest that the recommendation failed to observe, assess and value.   In assessing a sentence, the Court has the obligation to take certain steps so as to properly consider the individuality of the defendant, and the need to protect the public and consider the multiple goals of the criminal justice system under 18 U.S.C. §3553.  We believe that through any one of the departures sought or the variance sought or a combination of both, a sentence not greater than necessary would be one of probation and community service.

Although Mr. Goodman pleaded to a single count, it carried a mandatory minimum sentence, once the 5K1 letter was filed, Mr. Goodman is eligible for a sentence of probation. Section 3553(e).[2]  The ban on probation in sentencing in Class A cases is maintained except where the assistance of the defendant has been sufficiently substantial that the Government determines to move the sentencing court to impose a sentence below the statute's minimum, as in this case and thus, there is no prohibition on a probationary sentence.  See e.g. United States v. Simalavong, 924 F.Supp. 610 (D. Vt. 1995).[3]

---

[1]    We request that the sentence be imposed be set within Zone B i.e. 8-14 months Level 11.   Probation is authorized if the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention.   See U.S.S.G. § 5 C 1.   Zone A would permit a straight probationary sentence.

[2]    In the case of Mr. Goodman, who is a resident alien, his eligibility for probation would require for the Court to sentence him to a sentence that would be in Zones A or B.

[3]    Class A Felony is to be distinguished from sentencing Zones A and B.  The earlier in the alphabet the Zone is the lesser the

Honorable Dora L. Irizarry
May 10, 2013
Page 3 of 46

Mr. Goodman is deserving of probation principally
based upon his conduct since his arrest, his sincere remorse,
repentance, his deep sense of shame, his self-rehabilitation,
and the futility and loss that a sentence of incarceration at
this point in his life, especially since he is subject to
deportation as a consequence of this case.[4]  Since his arrest, he
has shown growth and rehabilitation, despite the emotional toll
it has taken upon him.  We hope that the Court will be unwilling
to disrupt a life that is on the road to full rehabilitation.

**THE OFFENSE**

Hugh Goodman was a "flight service clerk", a baggage
handler, for American Airlines at Kennedy Airport from 1994 to
2010.  For years he had a spotless record at work.  In 1998, Mr.
Goodman stumbled into Bourne's operation.  Goodman was afraid of
Bourne from the first, given his reputation.  He was recruited
by Bourne to participate in a minor role in one of Bourne's
criminal enterprises at the airport.[5]  He was initially asked to
serve as a look out, assuming that the item being illegally
offloaded was drugs.  In listening to the talk among the
coconspirators and from Bourne himself, Goodman knew that what
was being imported was cocaine.  The first time Goodman served
as lookout, he did not get any money.  The next time Bourne

---

sentence.  The earlier in the alphabet the felony is, the more
severe it is.

[4]  Mr. Goodman is a lawfully permanent resident alien having
arrived here from Barbados thirty-eight (38) years ago.  A
lawfully permanent resident alien is one who has been lawfully
accorded the privilege of residing in the United States as an
immigrant under 8 U.S.C. §1101 (a) (20).

[5]  Probation erroneously reported that Goodman was involved in
this conspiracy from 1994, Paragraph 9.  It appears to be a
grammatical error given that Bourne's conspiracy began in 1994.
The proof is that the PSR itself states that the cocaine
conspiracy was only between 2000 and 2009 (PSR paragraph 2).
The government's 5K1 letter states that the activities were from
1998 to July 2010 (Letter of April 9, 2013), citing and
repeating the PSR, but clarifies that it was the period of
employment from 1994 to 2010.  The government letter states that
Goodman was involved from 1998 to 2005.  The PSR makes no
notation of Goodman not being involved after 2005, a significant
fact for sentencing purposes.

Honorable Dora L. Irizarry
May 10, 2013
Page 4 of 46

asked Goodman to keep an eye out, once the closed containers
containing drugs were off loaded from the airplane, he paid him
a small amount of money. Goodman received $900, each of the six
times that he acted on Bourne's behalf.  On only two occasions,
Mr. Goodman retrieved bags from the cargo holds that had
headsets, and concealed cocaine bricks.  Mr. Goodman gave them
to Bourne.

**VOLUNTARY WITHDRAWAL**

         As is pointed out by the Government's 5K1 letter and
wholly omitted from the PSR and thus, not considered by
Probation as part of its recommendation, Mr. Goodman voluntarily
withdrew from the criminal activity in 2005, almost eight years
ago. He abandoned criminal behavior on his own initiative. He
walked away from it and the money it provided for his own peace
of mind because he was severely troubled by the criminal
behavior. Mr. Goodman decided to no longer work on crews with or
for Bourne in the smuggling operation.  He avoided Bourne and
his crew. Mr. Goodman was successful in having his schedule
changed so as not to be placed on Bourne's work details.   He
acted directly in response to his own private moral compass and
not at the direction of a court, a prosecutor or the airline. He
no longer wished to be part of any illegal activity.

         For almost five more years, without Mr. Goodman
participating in any way, the Bourne conspirators remained in
their smuggling operation until 2009 (PSR paragraph 13). Mr.
Goodman was not involved in the operations of the Bourne group
again after 2005.  As a matter of law, because he did nothing
about reporting the continuing crime, his actions would not give
rise to a complete defense of withdrawal.  As a matter of
sentencing, the complete abandonment of criminal activity is a
restoration  of  Mr.  Goodman's  moral  compass  and  self-
reintegration into society.   Mr. Goodman, by voluntary self-
determined withdrawal from criminal activity, put his criminal
behavior in the past.  He was well on the road to self-
redemption and fulfillment of the goals of sentencing.

         It is evidence of a unique case so as to justify a
sentence of probation.

Honorable Dora L. Irizarry
May 10, 2013
Page 5 of 46

## FIVE YEARS LATER: CONFESSION, PROFFER, AGREEMENT, GUILTY PLEA

In June 2010, Mr. Goodman out of the blue, was
approached by federal ICE agents. He was asked to come to their
offices voluntarily. They asked him for his cooperation
regarding the Bourne conspiracy. Mr. Goodman agreed to meet
with the agents and went on his own. At that meeting, Mr.
Goodman freely admitted his criminal conduct. He also told them
what he knew of the Bourne operation. Mr. Goodman participated
in proffer sessions. The session demonstrated he possessed
valuable and fresh information which he willingly offered to
prosecutors and agents. He provided detailed information about
himself. He readily inculpated himself and confessed his own
criminal acts in full. The disclosures about his own activity
enabled the prosecutors to assess Mr. Goodman's utility as a
witness at the trial of the co-conspirators. They were able to
determine whether or not he carried any "baggage" that could
hurt their case. The government obviously found him to be
truthful and useful. With the advice of counsel he signed a
cooperation agreement with the government. As part of the
cooperation agreement, Mr. Goodman pled guilty on July 23, 2010
to a single count of conspiring to import cocaine with no other
agreement except that he potentially could qualify to obtain a
5K1 letter.

Upon his entered plea, Mr. Goodman faced a mandatory
minimum sentence of ten years. He had no sentencing date and
the plea of guilty hung over him along with the full obligations
of the agreement. It felt to him that they would never be done
with him.

He was debriefed numerous times, both in the presence
of counsel and on his own by the government prosecutors, in
preparation and in expectation of being a government witness
against Bourne at Bourne's trial, providing insight into Bourne
and other criminal actors in the conspiracy. The preparation of
a cooperating witness for trial testimony is laborious and often
excruciatingly boring. See Gleeson, John; *Supervising Criminal
Investigations*, 5 J. L. & Poly 423,451 (1997). The government
placed Mr. Goodman's name on the witness list for the Bourne
trial. Mr. Goodman was prepared and fully expected to testify
at Bourne's trial, but as the government indicated, he was not
called through no fault of Mr. Goodman. Mr. Goodman was not
called as a witness, because it appeared at the last minute,

Honorable Dora L. Irizarry
May 10, 2013
Page 6 of 46

prosecutors decided not to call him as a witness because their evidence without him was sufficient. Mr. Goodman was still available to testify if rebuttal testimony would be needed.

## THE GUIDELINES CALCULATION

Mr. Goodman's Criminal History Category is I. Due to the weight based sentencing of the Guidelines, he is calculated as accountable for at least 30 kilograms of cocaine setting the Base Offense Level at 34. Because he receives a mitigating role adjustment under 3B1.2, Mr. Goodman is then given a three level reduction under the drug guideline, 2D1.1 (a) (5) (ii). His mitigating role decreases his offense level adjusting it three levels downward to level 31. The government stated that Mr. Goodman met the five criteria for safety valve eligibility under 5C1.2 for an adjustment under 2D1.1 (b)(16), further adjusting downward his offense level by 2 points to level 29. He is also then accorded his two more level downward adjustment for his minor role to level 27 and finally his offense level is further decreased by three levels for acceptance of responsibility. The resulting total offense level is 24. A level 24 Guideline yields a sentence chart range of 51-63 months, in Zone D in the absence of any departure or variance.

## PROBATION DEPARTMENT'S RECOMMENDATION

The Probation Department in a recommendation dated January 31, 2013 recommends thirty (30) months of custody which embodies it seems some consideration of his status as cooperating, even though the recommendation was made by the Probation Department even before it could have obtained a copy of the April 9, 2013 U.S.S.G. 5K1 letter.

## THE 5K1 LETTER

On April 9, 2013 the government submitted to this Court its final 5K1 letter on behalf of Mr. Goodman detailing his cooperation and the utility of such cooperation.

Mr. Goodman had been inside the organization, but his value exceeded that of the usual cooperator. He withdrew from the conspiracy and criminal behavior on his own initiative. When approached by federal agents, he voluntarily and willing admitted his guilt to the agents without the coercion of arrest or charges. Significantly his information was fresh,

Honorable Dora L. Irizarry
May 10, 2013
Page 7 of 46

exceptionally timely and useful, given that the Bourne group was still operating.

From the face of the letter, it is clear that Mr. Goodman's cooperation was substantial under 28 U.S.C. §994(n) which set out the rule that a sentence should be lower to take into account a defendant's substantial assistance in the investigation or the prosecution of another person, who has committed an offense. In this case, Mr. Goodman met both prongs of the statute. He assisted in the investigation as part of the investigative phase because Mr. Goodman's information enabled the government to apply for and obtain arrest warrants for two of the coconspirators. Mr. Goodman also provided the information, along with others that permitted the government to seek and obtain a superseding indictment that particularly charged Bourne with violating 21 U.S.C. §848, a continuing criminal drug enterprise. Bourne elected to go to trial. Mr. Goodman was prepared to testify at trial against Mr. Bourne and others in the conspiracy. 28 U.S.C. §994(n). Bourne went to trial and received a life sentence from Judge Garaufis, in part, on the cooperation of Mr. Goodman. Thus, his assistance was twice as substantial as a cooperator, who only could aid in one phase of the overall prosecution.

## PROBATION DEPARTMENT'S RECOMMENDATION IS FLAWED AND ITS RECOMMENDATION OF 30 MONTHS IS EXCESSIVE AND THUS SIMILARLY FLAWED

It is respectfully submitted, conscious as we are of Probation being an arm of the Court, that the Probation recommendation of 2-1/2 years is defective as matter of facts and law, because it fails to take into account facts and factors which the law requires the Court to take into account, in order to mete out a reasonable sentence.[6]

---

[6]    The Probation Report contains a legal error relevant to this inquiry stating that Probation is not available in this matter citing 18 U.S.C. §3561 (a)(1) and 21 U.S.C. §960 (b)(1)(B)(ii). PSR paragraph 57. Given that Probation had no 5K1 letter in hand, the face of the Report is correct as of the date of the Report, even though it was aware of the defendant's cooperation. (See P.2 of Probation Recommendation). Once the government filed the 5K1 letter, the legal statement is incorrect.

Honorable Dora L. Irizarry
May 10, 2013
Page 8 of 46

        One reason for this was pointed out by Judge Weinstein
in <u>United States v. Fatico (Fatico II)</u>, 458 F. Supp. 388, 397
(E.D.N.Y. 1978):

>    The typical presentence report "contains a fairly
>    superficial summary of the biographical facts of a
>    defendant's life." 8A Moore, Federal Practice, Op.
>    cit. supra, 32.03(3) at 32-39-40. The probation
>    officer  has  a  brief  period  to  make  his
>    investigation, and, burdened by a heavy caseload,
>    can devote limited time to each report. Id. at 32-
>    40. This limitation places an obligation on the
>    sentencing  judge,  either  to  supplement  the
>    information in the report from other sources, a task
>    for which judges have neither the time nor the
>    techniques  available,  or  else  to  subject  the
>    information  in  the  report  to  verification  or
>    correction.   Id. at 32-40 (footnote omitted).

        A further reason is that the Probation recommendation
process tilts to a mandatory Guideline system modified by their
recommendation.   By beginning with the weight as a measure of
severity, there is no complimentary measure of leniency.   The
adjustments seek to ameliorate the severity but do not actually
create sliding scales matching the level of harm caused by the
weight of the substance.  This is left for the sentencing judge
to struggle with on the basis of factors that the law requires
to be considered but peripherally discussed by the PSR and only
in the limited fashion of measurement against the Guidelines.
Such skews the process because the impetus of the Guidelines is
to effectuate longer sentences.

        The recommendation provides little if any guidance in
evaluating the relevant considerations under 18 U.S.C. §3553(a).
While using the words, sufficient but not greater than
necessary,  the  recommendation  fails  to  examine  either
sufficiency, necessity or the individual elements that make up
Mr. Goodman who it purports to evaluate.   Instead, it focuses
the Court on the amount of drugs, adheres closely to the
Guidelines methods, and picks a sentence that gives no basis for
its reliability for usage by this Court in its duty to arrive at
a sentence "sufficient but not greater than necessary" to
achieve the sentencing goals listed in 18 U.S.C. §3553 (a) (2).

Honorable Dora L. Irizarry
May 10, 2013
Page 9 of 46

Although the thirty months is less than the Guideline sentence, it appears to be a formulaic reduction rather than an individual consideration, given that Probation had not the tools to do an individual assessment other than some papers and a face to face to interview, primarily off a checklist.

The issue is further complicated by the revelation that 5K1.1 sentences are pegged at about 50% of all sentences and 45.8% for drug trafficking crimes. [7] See U.S. Sentencing Commission's 2012 Sourcebook of Federal Sentencing Statistics Table 30, found at and last reviewed April 27, 2013 http://www.ussc.gov/Data and Statistics/Annual Reports and Sourc ebooks/2012/sbtoc12.html.

This 50% discount is applied regardless of the quality of the cooperation. Thus the recommendation of the Probation Department is in lockstep with standard reductions for in effect all cooperators. It demonstrates a persuasive argument that all Mr. Goodman is provided by Probation's recommendation is a discount that is an across the board amount rather than sufficiently individualized assessment of the actual cooperation, the history and characteristics of the defendant and mirrors the narrowing of the options by conformity as opposed to fulfilling the goals of uniformity in the individualized context. Whether the discount approach is actually the measure or merely a coincidence as to Mr. Goodman, it is not appropriate for sentencing a cooperating defendant.

In Gall v. United States, 552 U.S. 38 (2007), the Court stated that a mathematical approach also suffers from infirmities of application. On one side of the equation, deviations from the Guidelines range will always appear more extreme, in percentage terms, when the range itself is low, and a sentence of probation will always be a 100% departure regardless of whether the Guidelines range is 1 month or 100 years. Moreover, quantifying the variance as a certain percentage of the maximum, minimum, or median prison sentence recommended by the Guidelines gives no weight to the "substantial restriction of freedom" involved in a term of supervised release or probation. Gall, Id. The Court further commented:

---

[7]     The percentages are consistent year to year as indicated by the Sourcebooks.

Honorable Dora L. Irizarry
May 10, 2013
Page 10 of 46

> On the other side of the equation, the mathematical
> approach assumes the existence of some ascertainable
> method of assigning percentages to various
> justifications. Does withdrawal from a conspiracy
> justify more or less than, say, a 30% reduction?
> Does it matter that the withdrawal occurred several
> years ago? Is it relevant that the withdrawal was
> motivated by a decision to discontinue the use of
> drugs and to lead a better life?  What percentage,
> if any, should be assigned to evidence that a
> defendant poses no future threat to society, or to
> evidence that innocent third parties are dependent
> on him?   The formula is a classic example of
> attempting to measure an inventory of apples by
> counting oranges. <u>Gall</u>, <u>Id.</u>

The recommendation does not even examine the factors
listed in U.S.S.G. 5K1.0 for assessing cooperation's value.[8]
Because it recommended thirty months before the actual 5K1
letter, the recommendation could not have actually taken into
account the government's evaluation of the assistance rendered.
The PSR narrative and the 5K1 letter do not overlap on the facts
and conclusions on the nature and value of Mr. Goodman's
cooperation.   This recommendation comes to its conclusion by
using the projected amount of cocaine imported on the Bourne
flights as an aggravating factor (PSR 63) assumedly weighing
against a further reduction of sentence.  Probation acknowledged

---

[8]   In assessing cooperation under 5K1, the Court assesses the
amount of reduction of the sentence from the baseline Guideline
or the mandatory minimum sentence, whichever is lower.  The
Guidelines provide that the court in assessing the amount of the
reduction "shall be determined by the court for reasons stated
that may include, but are not limited to, consideration of the
following":
(1) the court's evaluation of the significance and usefulness
of the defendant's assistance, taking into consideration the
government's evaluation of the assistance rendered;
See §5K1.1, comment. (n. 3)
(2) the truthfulness, completeness, and reliability of any
information or testimony provided by the defendant;
(3)  the extent of the defendant's assistance;
(4)  any injury suffered, or any danger or risk of injury to the
defendant or his family resulting from his assistance;
(5)  the timeliness of the defendant's assistance.

Honorable Dora L. Irizarry
May 10, 2013
Page 11 of 46

that there would be a 5K1 letter but did not have the actual 5K1
letter in hand.   It had no facts to even seek a factor that
would warrant a sentence outside of the Guidelines.   It seems
institutionally unless otherwise prompted the recommendation
system has no incentive to assess the quality of the
cooperation.

        In Gall 552 U.S. at 50 n.6, 56-60, the Court stated
that 18 U.S.C. §3553(a) (1) is a "broad command to consider . .
. the history and characteristics of the defendant".   The Gall
Court approved variance from the Guidelines sentence based on
factors the policy statements deem "not" or "not ordinarily
relevant" for departure.   In Pepper v. United States, 131 S.Ct.
1229 (2011), the Court stated that judges were free to disagree
with policy statements particularly when they "rest on wholly
unconvincing policy rationales not reflected in the sentencing
statutes Congress enacted".

        The typical cooperator can earn his 5K1 letter by
admitting guilt, being debriefed, and being ready and able to
testify for the government in the case.   The cooperator usually
cannot engage in other criminality without violating the terms
of the agreement and losing the access to a 5K1 letter.   Often
in a drug case, the cooperator serves as a living breathing
criminal who corroborates the federal agents' testimony, the
wiretaps or other evidence.   The government often wants someone
who has been deep inside the organization and can provide inside
information.   The recommendation was at best designed for the
typical cooperator.

        Mr. Goodman was an atypical cooperator.   The alacrity
and consistency of Mr. Goodman's cooperation was without
hesitation.   He was willing and able to go further than the
ordinary cooperator by being willing to testify against Bourne,
despite his absolute paralyzing fear of Bourne and his
associates in the United States and the Barbados.

        The Probation recommendation makes no reference to the
fact that Mr. Goodman's alacrity in cooperating upon being
approached by ICE Agents, thus not taking into account the
extent of the defendant's assistance, the freshness of the
information or the timeliness of the assistance of Mr. Goodman
in terms of providing information that gave a basis for arrest
warrants.   He did not invoke his rights or seek counsel.   He
spoke to them fully and freely.   Further, although the

Honorable Dora L. Irizarry
May 10, 2013
Page 12 of 46

government was aware of Mr. Goodman's fear of Bourne and the
other members of his crew, the recommendation was silent on the
issue of any danger or risk of injury to the defendant or his
family resulting from his assistance. This is one factor that
Probation's recommendation does not consider or mention even
though Mr. Goodman's self-inculpation and willing cooperation
are significant aspects of the defendant's cooperation and his
characteristics.

The most significance rehabilitative fact is that Mr.
Goodman abandoned criminal activity in 2005 on his own
initiative because he did not want to commit criminal behavior.
This factor was found to be impressive by the United States
Supreme Court in Gall, supra, but inexplicably not by the
Probation Department in the Eastern District. The Supreme Court
was most impressed with Gall's voluntary withdrawal. It quoted
the District Judge's findings that virtually no conspiracy
defendants voluntarily withdraw; Gall did, and did so years
before he even knew he was the target of a federal
investigation. In the Gall Court's eyes, this was a sign of
genuine rehabilitation, "Compared to a case where the offender's
rehabilitation occurred after he was charged with a crime, the
District Court here had greater justification for believing
Gall's turnaround was genuine, as distinct from a transparent
attempt to build a mitigation case." Further, in assessing the
elements of 18 U.S.C. §3553(a), the Supreme Court approved of
the District Court's quite reasonably attaching great weight to
Gall's self-motivated rehabilitation, which was undertaken not
at the direction of, or under supervision by, any court, but on
his own initiative. The Supreme Court stated that the self-
motivated rehabilitation lent strong support to the conclusion
that imprisonment was not necessary to deter Gall from engaging
in future criminal conduct or to protect the public from his
future criminal acts. See 18 U.S.C. §3553(a)(2)(B) and (C). Yet
not a word of this legal and evaluative element found by the
Supreme Court to be a factor justifying a sentence outside any
Guideline is found to be a factor by Eastern District of New
York's Probation in its recommendation.

Such omission calls into question the quality of the
assessment. The PSR not only fails to take into account the
specific facts and circumstances of the unique role played by
Mr. Goodman, his actions in voluntarily ceasing criminal
activity, or his openness with the government at his own peril,
Probation failed to consider the extent of Mr. Goodman's

Honorable Dora L. Irizarry
May 10, 2013
Page 13 of 46

assistance since it had no 5K1 letter.  It failed to consider
the timeliness of Mr. Goodman's assistance.[9]

        A further reason for the Court to consider probation
because the recommendation is silent on the five year long delay
between the termination of his criminal behavior in 2005, and
his arrest in 2010 following his admissions, and the further
almost three year delay in his sentencing is analogous to a
defendant being resentenced after an appellate process, while
out on bail.  As a condition of his plea of guilty he had to
resign from the best job he ever had at American Airlines.  He
was unable to find work.  He finally obtained gainful employment
on a lobster boat that was then damaged in Hurricane Sandy.  Mr.
Goodman's history of steady employment at the airlines, years of
unblemished behavior and loss of employment were all elements
that would allow for a lower sentence than the recommendation
captures.  Indeed the recommendation is silent on his employment
history.  It is silent upon his deep and abiding remorse as well
as other factors discussed herein that should have been evident
to a probation evaluation of factors that it claims does not
exist both for departures and variance.

**THE LAW OF DEPARTURES**

        A  departure  from  the  Sentencing  Guidelines  is
appropriate if the court finds "that there exists an aggravating
or mitigating circumstance of a kind, or to a degree, not
adequately taken into consideration by the Sentencing Commission
in formulating the guidelines that should result in a sentence
different from that described." 18 U.S.C. §3553(b) United States
Sentencing Commission, Guidelines Manual, § 5K2.0, p.s.

        Departure is warranted for those cases which fall
outside the "heartland." U.S.S.G. §5K2.0. Section 5K2.0 provides
for downward departures under the following conditions in the
discretion of the court.  Subpart (a)(1)(A) provides for a

---

[9]    See §5K1.1, comment.  (n.3) (stating that the court should
give "substantial weight . . . to the government's evaluation of
the extent of the defendant's assistance, particularly where the
extent and value of the assistance are difficult to ascertain").
It  is  clear  that  the  Probation  Department  made  its
recommendation in the absence of the 5K1 letter and thus its
recommendation could not give substantial weight to extent of
Mr. Goodman's assistance.

Honorable Dora L. Irizarry
May 10, 2013
Page 14 of 46

departure if there are mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission that should result in a sentence lower than that calculated under the Guidelines, which is fundamentally the standard for any departure. Subpart (a) (2) provides for a departure based upon circumstances of a kind not adequately taken into consideration by the Sentencing Commission, including both Identified Circumstances and Unidentified Circumstances. Subpart (a) (3) provides for a departure in exceptional cases based upon circumstances present to a degree not adequately taken into consideration by the Sentencing Commission. Subpart (a) (4) provides for a departure based upon an offender characteristic, set forth in Section H, or other circumstance which is present to an exceptional degree. Finally Subpart (c) provides for a departure based upon a combination of two or more offender characteristics or other circumstances, none of which is independently sufficient to support a departure, if they make the case an exceptional one, are present to a substantial degree, and are identified in the Guidelines as a permissible ground for departure. U.S.S.G. §5K2.0 continues to function as a significant source of authority for judges to take mitigating circumstances into account, even as formal departures. The only favored departures, according to the Commission Guidelines, are cooperation under 5K1 and a safety valve adjustment to mitigate the mandatory minimum sentence under the drug laws. All other sentencing factors that could reduce the sentence are disfavored and thus require extraordinary circumstances. Case law has relaxed the textual rigor of the Guidelines in the atypical case.

As the Second Circuit has stated, the power to depart affords a "`sensible flexibility' to insure that atypical cases are not shoe-horned into a Guidelines range that is formulated only for typical cases." United States v. Rogers, 972 F.2d 489, 493 (2d Cir. 1992). See also United States v. Merritt, 988 F.2d. 1298, 1309 (2d Cir. 1993) (holding that the authority to depart is fundamental to the satisfactory functioning of the Sentencing Guidelines). The mechanical numbers of the Guidelines are not sufficient to encapsulate the varieties and vagaries of human nature which are an essential component of a sentence individualized and reasonable in this day and age. From the very first, the Sentencing Commission itself acknowledged that the Guidelines do not take into account "the vast range of human

Honorable Dora L. Irizarry
May 10, 2013
Page 15 of 46

conduct potentially relevant to a sentencing decision."
U.S.S.G. § 1A1.1. (4)(b) (1987 Ed).

## REASONS TO PROVIDE MR. GOODMAN WITH A FURTHER
## DOWNWARD DEPARTURE BEYOND THE PSR

Over and above the substantial assistance departure
and the extraordinary cooperation of Mr. Goodman based upon Mr.
Goodman's self-motivated turning his back on lucrative criminal
opportunities and his return to a law abiding life, as well as
consideration of the danger to Mr. Goodman's life by his
willingness to testify against Mr. Bourne, whether carried out
in the United States or the Barbados, there are additional basis
for departure.

Before a departure is permitted, certain aspects of
the case must be found unusual enough for it to fall outside the
heartland of cases in the Guideline. The Guidelines acknowledge
that departures may be considered when the conduct differs
significantly from the norm. U.S.S.G. Ch. 1 Pt. A (4) (b).
United States v. Milikowsky, 65 F.3d 4, 7 (2d Cir. 1995). The
district court must make a refined assessment of the many facts
bearing on the outcome, informed by its vantage point and day-
to-day experience in criminal sentencing. Whether a given
factor is present to a degree not adequately considered by the
Commission, or whether a discouraged factor nonetheless
justifies departure because it is present in some unusual or
exceptional way, are matters determined in large part by
comparison with the facts of other Guidelines cases. In light
of the unique and unusual circumstances presented by this case,
it is clear that it falls outside the heartland of cases and
that a downward departure is warranted on the basis set forth
below.

The areas for consideration for a 5K2.0 departure for
Mr. Goodman are Mr. Goodman's exceptional remorse and
repentance, his stable employment, his cultural assimilation in
the United States after thirty five years in this county,
vulnerability in prison, his post offense rehabilitation, and
the impact upon him of deportation even in light of the relevant
Second Circuit case law.[10]       Finally, Mr. Goodman seeks a

---

[10]    Mr. Goodman seeks to press the issue of the impact of
deportation, which admittedly is not approved by this Circuit.
As a general rule, one's status as an alien is not sufficient to

Honorable Dora L. Irizarry
May 10, 2013
Page 16 of 46

departure on this combination of circumstances permits a
departure mixture of these factors may itself, although
insufficient alone may be a basis for a departure below the
recommended sentence. See United States v. Rioux, 97 F.3d 648
(2d Cir. 1996) holding that extraordinary cases the District
Court may depart downward when a number of factors considered
individually would not permit a downward departure then combine
to create a situation that differs significantly from the
heartland cases covered by the Guidelines. Id. at 663.

## THE LAW OF VARIANCE

A defendant is eligible for a non-Guideline sentence
or a variance. A sentencing decision is made after conducting
an appropriate evaluation under the dictates of Title 18 U.S.C.
§3553. The court considered "the nature and circumstances of
the offense and the history and characteristics of the
defendant," as well as the Guideline computation, deterrence
issues and other elements, and a sentence is crafted that is
"sufficient, but not greater than necessary, to comply with"
statutory purposes. 18 U.S.C. §3553(a). A sentencing judge is
no longer bound by the penal theories that inform the
guidelines, and may substitute a theory of one's own if doing so
would advance the aims of the § 3553(a) sentencing factors. See
Spears v. United States, 555 U.S. 261 (2009); Kimbrough v.
United States, 552 U.S. 87, 101-02 (2007); Rita v. United
States, 551 U.S. 338, 351 (2007). The Sentencing Commission
performs its function at wholesale while district courts in
sentencing perform their function at retail. Rita, supra, 551
U.S. at 347-348, comparing 18 U.S.C. §3553(a) with 28 U.S.C.
§991 (b). The sentencing court must make an individualized
assessment based on the facts presented and upon a thorough
consideration of all the 3553(a) factors. Gall, 552 U.S. at 50.
The sentencing commission fulfills an important institutional
role but the sentencing court has greater familiarity with the
individual case and defendant before the Court for sentencing.
Kimbrough, 552 U.S. at, 109. Even when a particular defendant
presents no special mitigating circumstances such as no
"outstanding service to country or community", a sentencing

---

take the case out of the "heartland," and thus is not grounds
for a downward departure. United States v. Restrepo, 999 F.2d
640, 644 (2d Cir.1993); United States v. Willis, 476 F.3d 103
(2d Cir. 2007), even though it is part of the history and
characteristics of a defendant equal to race or ethnicity.

Honorable Dora L. Irizarry
May 10, 2013
Page 17 of 46

court may nonetheless vary downward from the advisory Guideline
range based solely on the sentencing court's disagreement with
the Guidelines.    See  Spears,  supra.    District courts  are
"generally free to impose sentences outside the recommended
[Guidelines] range" but "must consider the extent of the
deviation and ensure that the justification is sufficiently
compelling to support the degree of the variance."    United
States v. Stewart, 590 F.3d 93, 135-136 (2nd Cir. 2009).    The
Court has discretion to deviate from the Guidelines in even a
"mine run" case.

        A court must give respectful consideration to the
Guidelines but the court may tailor the sentence to "impose a
sentence sufficient, but not greater than necessary" to
accomplish the goals of sentencing pursuant to 18 U.S.C.
§3553(a);  See  Gall,  552  U.S.  at  50  ("extraordinary"
circumstances are not required to justify sentence outside the
guidelines); Spears, Id. (explaining that Kimbrough holds that a
categorical disagreement with and variance from the crack
cocaine Guidelines is not suspect); Nelson v. United States, 129
S.Ct. 890 (Jan. 26, 2009) (reiterating that the Guidelines are
not mandatory on sentencing courts and are not to be presumed
reasonable).    The body of this decisional law allows a Court to
craft a sentence that is appropriate after considering the
Guidelines and considering whether the Court agrees with the
policy issues behind such Guidelines, when sentencing the
particular defendant and considering all the factors of 18
U.S.C. §3553 (a).    Each defendant is entitled to be considered
as an individual and unique study in the human failings that
sometimes mitigate, sometimes magnify, the crime and the
punishment to ensue.    Pepper, 131 S.Ct. at 1239-1240 (Sotomayor,
J.).

        The  Guidelines  are  not  the  only  consideration,
however.    Accordingly, after giving both parties an opportunity
to argue for whatever sentence they deem appropriate, the
district judge should then consider all of the §3553(a) factors
to determine whether they support the sentence requested by a
party.    The sentencing court may not presume that the Guidelines
range is reasonable. The Court must make an individualized
assessment based on the facts presented.    If the Court decides
that an outside-Guidelines sentence is warranted, it must
consider the extent of the deviation and ensure that the
justification is sufficiently compelling to support the degree
of the variance.

Honorable Dora L. Irizarry
May 10, 2013
Page 18 of 46

## OVERLAP OF DEPARTURES AND VARIANCE

It seems clear that while some departures that are disfavored under the Guidelines system are now available for consideration of the Court under the variance system that now governs federal sentences. This Court has discretion to vary from the prescribed Guideline offense levels and should do so to a degree lower than the recommendation of probation. This Court may exercise its independent judgment to preserve fairness and ensure that the resulting sentence for Mr. Goodman is "sufficient but not greater than necessary" to serve the goals of sentencing. 18 U.S.C. §3553(a). Gall "indicates that factors disfavored by the Sentencing Commission may be relied on by the district court in fashioning an appropriate sentence." To that end, the following sections apply to departures under 5K2.0 or in the alternative to variances under the rubric of Gall and Kimbrough. The reasons for a departure and a variance are the following: Mr. Goodman's exceptional remorse and repentance, his stable employment, his cultural assimilation in the United States after thirty five years in this county, vulnerability in prison, his post offense rehabilitation and the issue of the impact of his deportation even in light of the relevant Second Circuit case law.

## EXCEPTIONAL REMORSE AND REPENTANCE

Mr. Goodman, from the moment that he gave up dealing with Bourne and rejected criminal behavior, has been remorseful and shameful. At every stage, when he spoke to the agents willingly, when he was debriefed by the agents and the U.S. Attorney's Office, when he spoke to counsel, to probation, to pretrial and to the court, has been abject in his remorse and demonstrated that it is heartfelt and sincere, not a late day conversion occasioned by being caught. It is of paramount importance that Mr. Goodman has recognized for some time that what he did was wrong. For years he lived with his secret until ICE agents approached him. Mr. Goodman before he spoke to the agents and even as he spoke to them recognized the gravity of his offense, accepted the blame for his criminal behavior without flinching, and expressed deep remorse and shame. Such actions were above and beyond acceptance of responsibility, but were and remain extraordinary acceptance of responsibility. Under U.S.S.G. 3E1.1, it is not required that defendants offer up expressions of remorse or shame. It only requires truthful

Honorable Dora L. Irizarry
May 10, 2013
Page 19 of 46

admission of criminal conduct and provides extra credit for not
forcing the government to go through the effort and expense of a
trial, providing a three point benefit. It is not the
application of mercy as a moral virtue earned by the defendant
out of evidencing repentance and remorse. It rewards a mere
apology, a public linguistic performance in the form of a plea
of guilty without any requisite moral component. Where a
defendant goes beyond these minimal requirements both in his
shame and repentance demonstrated by his activity after the
criminal behavior and beyond, he should obtain extra credit for
extraordinary acceptance of responsibility beyond the three
point benefit.

        Beyond the issue of three point benefits or more,
there is also the element of evaluating the defendant's
exceptional remorse and repentance so as to depart on that basis
alone, separate from extraordinary acceptance. Mr. Goodman's
repentance remorse and shame are such that they should be
considered as extraordinary. What makes them extraordinary is
the fact that they are evidence of sincere personal repentance.
Repentance is the remorseful acceptance of responsibility for
one's wrongful and harmful actions, the repudiation of the
aspects of the character of the self that generated the actions
along with the resolve to do one's best to extirpate those
aspects of one's character and resolve to atone and make amends
for the harm one has done. Remorse is only one component of
repentance. Remorse is an independent virtue from repentance.
Remorse is the active changing of the self, a disassociative
rejection of the blameworthy self. It transitions a person into
someone who is better. A penitent person has a better
understanding of the badness of their behavior, and thus has a
better character than a non-repentant person. Such a defendant
is less likely to re-offend because of this internal
transformation. Similarly such an awareness and emotional
change makes one less dangerous.

        Admittedly whatever suffering Mr. Goodman has endured
is a result of choices made. But his urge to make amends goes
beyond mere apology to the court or to others. Mr. Goodman's
remorse is the result of his painful combination of guilt and
shame. He accepts that he is responsible for seriously wronging
the country that he has lived in for thirty eight years. He is
aware that he has brought shame on his family. His shame is so
great he cannot bear to ask them to write a letter to the Court
or stand with him to appear on his behalf. He does not want to

Honorable Dora L. Irizarry
May 10, 2013
Page 20 of 46

be seen in their eyes as he sees himself in his own. He is face to face with himself as a flawed and defective human being who has fallen far below who he was and wants to be. He has done everything possible in this case to evidence his resolve to become a new and better person. He is desperate to restore the moral balance that his own wrongful acts have upset. To that end, he was cooperative and eager to aid the government, even at the cost of his own freedom and maybe his well-being. Mr. Goodman has met with the government lawyers and agents and explicitly disclosed facts that establish wrongdoing and accept responsibility for what he has done. Sincerely remorseful and repentant, Mr. Goodman has gone beyond the acceptance of responsibility of a timely guilty plea or grudgingly cooperating.

Because the Court must consider the defendants history and characteristics, it is appropriate to measure Mr. Goodman's remorse and repentance by the impact as well as the acts. For him as it is for some people the fact that his wrongdoing is explicit and public is quite personally painful. It is although deserved, painfully humiliating to him. The pain and shame are so visceral as to be the equivalent of physical pain. He has engaged in the process of reflection and introspection such that it is an essential part of his already accomplished rehabilitation. He has reinvigorated the internal checks that usually keep people from committing crimes in the first place. Mr. Goodman is truly remorseful and apologetic and actively engaged in his own repentance. Beginning with his private repudiation of Bourne's criminal activity and his ceasing his own criminal behavior, Mr. Goodman took steps on the road to moral rebirth without intervention but on his own initiative. The significance of such penitential activities is that it reduces the need for punishment to demonstrate deterrence because he is far further along on the continuum of assuring that he will not engage in any future social harm due to his own efforts, even before he was arrested. Remorseful and repentant wrongdoers need less deterrence because his own conscience has elicited from him a higher price than most mine run defendants who apologize at sentencing having shown little effort at atonement.

The significance of such remorse and repentance is that such a person is less dangerous, less likely to commit another wrongful or criminal act than other defendants. Thus it impacts upon Mr. Goodman's history and characteristics, the need

for general and individual deterrence and diminishes any need to incapacitate him to protect society. Mr. Goodman's deep repentance has been judged by the government as real and authentic and not contrived for the moment of sentencing or faked as a requirement for leniency. They come to that judgment on the basis of the time that they have spent with Mr. Goodman debriefing him and questioning designed in part to ferret out any feigning behavior. Mr. Goodman demonstrated moral worthiness, contrition and self-rehabilitation. His cooperation was atonement for his misdeeds.

The fact that remorse and repentance would justify a lower sentence is not addressed in the recommendation. A truly remorseful and repentant defendant demonstrates that the system has done its work and achieved its goals without the need of incarceration. Further, if general deterrence is a key goal then the purpose of general deterrence is served by the non-incarceration of the truly repentant and remorseful as it is by the convicted defendant. General deterrence cannot work solely to justify incarceration since it is designed to create a specific society wide goal of non-criminal behavior. Repentance and remorse are a message of general deterrence in that the person is self-shamed, not by order of the process but by their own condemnation assuming one truly believes that general deterrence works by getting the word out to cause conformity to legal norms in the behavior of people.

The retributive goal of the sentence is designed to demonstrate that the punishment occurs because the offender deserves it. Punishment is to be scaled to the objective moral seriousness of the offense. But in this process, such punishment is tempered by examination of the character of the defendant. It is clear that no one is in fact the worst thing they ever did. Human beings are so much more than their criminal behavior. In this situation, Bourne approached Mr. Goodman. Mr. Goodman did not seek out the criminal behavior but it found him based on the circumstances of the shifts doled out at the airport for off-loading airplanes. He was never previously involved in such activity and was never tempted to be. In all respects Mr. Goodman was a passive criminal in that he went along with what Bourne and others were doing and took some money for it. His only affirmative action really was to individually withdraw from criminality on his own. Mr. Goodman's remorse and repentance demonstrate that he has disassociated himself from the wrongful actions, he has affirmed

Honorable Dora L. Irizarry
May 10, 2013
Page 22 of 46

publicly and privately the legal norms of the community and
demonstrated that he wishes to rejoin the society and
reintegrate into the social fabric so as to need no for jail
time as punishment.

As to the individual defendant who is entitled to just
desserts but no more, the actual repentance and remorse
demonstrate that jail is not always the answer to the riddle of
punishment. He has been a responsible law abiding citizen
because by admitting his conduct and agreeing to testify against
Bourne and the others he has not only renounced criminality but
he has stepped forward to bring such criminality to an end and
to bring the offenders to the bar of justice. Mr. Goodman is
such a person.

**POST-OFFENSE REHABILITATION**

The instant offense and the other activity seven years
ago are serious and remain so but the character of this
defendant is in fact good. He is remorseful, thoughtful and
taken full and total responsibility for his criminal act, and
has single handedly untaken his own course of rehabilitation
successfully. He has in the intervening years demonstrated a
concerted effort to regain his earlier good character, and to
return to his life's path and avoid criminality.

He has remained at the beck and call of the government
under the terms of his agreement. He has patiently waited for
sentencing for more than two years, during which his fate was
unknown and hung over his every waking hour.

He has demonstrated a concerted effort to reform
himself. Since his last illegal conduct, he has taken many
steps to succeed beginning with his answering questions of
agents at his own peril without counsel, his willingness to
cooperate even after being told he was to be arrested despite
his help, the agreement to cooperate, his debriefings and
preparation to testify. He is employed in a steady employment,
with the exception of the period of time after resigning from
the airline and being unable, like so many Americans, to find
work allowing him to earn a living. His employment history was
interrupted by having to resign from American Airlines as a
condition of his guilty plea and a hurricane. He is leading a
useful life externally in society by acting properly and
internally by his spiritual development. His release on bail

Honorable Dora L. Irizarry
May 10, 2013
Page 23 of 46

for these many years demonstrates a wholly productive
reintegration into society.[11]

        The issue for this sentence is whether or not for
punitive purposes should a life well on its way to full and
complete social reintegration be interrupted in order that the
there be a rending of the pound of flesh that seems to be
demanded of him but that the law does not require.

## HIS STABLE EMPLOYMENT

        Mr. Goodman has been stably and consistently employed
all of his adult life. From 1994 until 2010, he was employed
with American Airlines. It was during this sixteen year period
of regular employment that he committed the subject crime over a
two year period. As part of his plea agreement with the
government in this case, he was required to resign from that
job.

        After resigning from the airline, he was unable to
find work In part because he was depressed and in part because
the general problem of catching on in the work force was at its
worst in that period with little or no job growth.

        In May 2012, he was engaged as a deck hand on a
lobster boat that sails from a marina in Brooklyn. All went
well until Hurricane Sandy damaged the vessel. The result was
that Mr. Goodman's hours were greatly reduced.

        Mr. Goodman has demonstrated stable employment in the
years prior to the criminal behavior, after the behavior, prior
to arrest and after his arrest. Sentencing Commission's studies
demonstrate that stable employment in the year prior to arrest
is associated with a lower risk of recidivism. In United States
v. Ruff, 535 F.3d 999, 1001 (9th Cir. 2008), involving
convictions for health care fraud and embezzlement, the district
court cited as one of several mitigating factors the defendant's

---

[11]   His arrest for driving with a suspended license did not
result in a conviction. The license was suspended because he
was behind on his child support payments, in part, because he
had to resign from the airline as a condition of his plea of
guilty. The arrest was an aberration. He drove on that day
only because he had to get to a friend's funeral, forgetting
that his license was suspended.

Honorable Dora L. Irizarry
May 10, 2013
Page 24 of 46

"history of strong employment" in granting a variance from 30-37 months' imprisonment to one day of imprisonment followed by three years' supervised release (to be partially served in a community confinement facility), in part so that the defendant could continue to work. See United States v. Ruff, the Ninth Circuit's affirmance relied on Gall and without mentioning the Commission's policy. In a case involving heroin trafficking, the Tenth Circuit affirmed a below guideline sentence under 18 U.S.C. §3553(a) of one year and a day in prison, plus a year of home confinement and five years of supervised release, where the guidelines called for a sentence of 63-78 months. See United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008). Among other things, the district court considered the defendant's stable employment history as evidence that he was unlikely to re-offend. Id. at 1148-49.

## HIS CULTURAL ASSIMILATION

A collateral consequence is the impact upon a defendant if he is deported to a place where he has never actually lived. In the case of full cultural assimilation to the United States, the result of the crime is not mere return from the homeland but actual exile. It is forbidden to sentence people to exile. Under U.S.S.G. §2L1.2 at Application note 8, the Commission has allowed for consideration of cultural assimilation as a factor to consider in cases of illegal return when the primary motivation is the cultural assimilation. In the context of that note, the Commission defines "cultural assimilation". There is no basis to conclude that it cannot be used as a basis for a departure under the catch-all provision for a defendant like Mr. Goodman, who has been a thirty eight year resident of the United States emigrating from Barbados at the age of five.

Culture is distinct from prohibited areas such as race and national origin, because it is not dependent upon where a particular person was born or a person's lineage, but rather upon a myriad of learned and acquired factors, stemming from, for example, the type of socializing institutions the person was exposed to during that person's formative years. If culture were solely dependent on national origin, it would lead to the absurd result that one who was born and raised in France should absolutely share the same cultural beliefs and practices as one who was born in France but raised in America. If culture were solely dependent on race or ethnicity, it would mean that

Honorable Dora L. Irizarry
May 10, 2013
Page 25 of 46

regardless of what type of community or values one was raised in, a person of Chinese descent who is a Chinese national should absolutely share the same cultural beliefs and practices as a third or fourth generation Chinese-American, simply because the two are both of Chinese lineage. Thus, as opposed to immutable characteristics that people cannot change, such as race or national origin, people learn and acquire their culture from their society of up-bringing in a process termed "enculturation." See Neff, *Removing The Blinders In Federal Sentencing: Cultural Difference As A Proper Departure Ground*, 78 Chi Kent L R 445 (2003).

In this case, it is not the cultural aspects that occasioned the commission of the crime, but rather the outcome of the punishment that raises the issue. To that extent it means something different as to Mr. Goodman. Mr. Goodman has no connection with Barbados given that his family is here. His cultural assimilation is that of the United States. Conviction leads to deportation and rips him from the culture that he knows into one that is fundamentally alien to him. While deportation per se may not be considered, see below, the impact of the sentence and conviction can be ameliorate by the cultural harm yet to be done to Mr. Goodman.

The Commission defines cultural assimilation as to be considered where the defendant formed cultural ties primarily with the United States from having resided continuously in the United States from childhood:

> In determining whether such a departure is appropriate, the court should consider, among other things, (1) the age in childhood at which the defendant began residing continuously in the United States, (2) whether and for how long the defendant attended school in the United States, (3) the duration of the defendant's continued residence in the United States, (4) the duration of the defendant's presence outside the United States, (5) the nature and extent of the defendant's familial and cultural ties inside the United States, and the nature and extent of such ties outside the United States, (6) the seriousness of the defendant's criminal history, and (7) whether the defendant engaged in additional criminal activity after illegally reentering the United States.

Honorable Dora L. Irizarry
May 10, 2013
Page 26 of 46

On the basis of this definition, Mr. Goodman would qualify for such a departure even if it is disfavored in the cases of non-immigration crimes.[12] Because culture implicates a different set of considerations and norms, than do prohibited factors such as race and national origin, courts should distinguish cultural difference and view it as a proper departure ground under the sentencing guidelines. The Sentencing Commission has never addressed or proscribed "cultural assimilation" per se as a factor that may justify departure. The Second Circuit has never recognized cultural assimilation as a basis for a downward departure United States v. Ticas, 219 F. App'x 44, 45 (2d Cir. 2007). For a defendant to be sentence who is subject to deportation and has been fully culturally assimilated into the United States, the direct consequence of the conviction, deportation or removal should allow a sentencing court under U.S.S.G. § 5K2.0 to consider evidence of cultural assimilation to ameliorate the impact of the sentence. In a sense every departure under 5H is designed to ensure that a defendant does no harder time than any other prisoner within the same reasonable ranges. Because cultural assimilation is "a factor [that] is unmentioned in the Guidelines," a sentencing court can only depart on this basis after considering "the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole." Koon, 518 U.S. 81, 92 (1996).

Cultural assimilation may speak to the defendant's character. Recognizing cultural assimilation as a factor that may justify departure therefore, would not result in the arbitrary dividing line between all aliens and all citizens. Cultural assimilation may be relevant to sentencing if a district court finds that a defendant's unusual cultural ties to the United States may be relevant to the character of a defendant. It speaks to an individual defendant's offense, his conduct and his character, and not just to possible future events unrelated to the crime.

In light of the unique circumstances presented by this case, it is clear that it falls outside the heartland of cases and that a downward departure is warranted for the reasons set forth below.

---

12     Admittedly, factor seven is inapplicable to this case.

Honorable Dora L. Irizarry
May 10, 2013
Page 27 of 46

## VULNERABILITY OF MR. GOODMAN IN FEDERAL PRISON

The government in their 5K1 letter refers to Mr. Goodman as an extreme shy person. Not only is he shy but he is a man that fundamentally lives in fear. Slight in appearance and peaceful in nature, he was frightened by Bourne and his associates. He was frightened about cooperating and actively concerned about his own safety and remains so. But it is his slight appearance that mirrors his personality that makes him particularly vulnerable in jail. Additionally, as a cooperator he is also vulnerable in jail, even a jail of all cooperators, there is a pecking order and a hierarchy of size and strength.

Physical appearance, including physique, can mean that a sentence of imprisonment, or a particularly long one, is unnecessarily cruel. U.S.S.G. §5H1.4 makes "physical appearance, including physique" a discouraged factor, but under United States v. Booker, 543 U.S. 220 (2005) and its progeny, grant district courts greater discretion to consider this part of the defendant's circumstances. Physique is precisely the type of evidence that establishes deliberate indifference to prison rape under the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825 (1994); Wilson v. Wright, 998 F.Supp. 650 (E.D. Va. 1998); see also Redman v. County of San Diego, 942 F.2d 1435 (9th Cir. 1991) (en banc); Withers v. Levine, 615 F.2d 158, 160 (4th Cir. 1980). In this Circuit, federal judges, familiar with the Eighth Amendment standard for deliberate indifference and the typical victim profile for prison abuse, have taken physical size and appearance into account at sentencing. See United States v. Lara, 905 F.2d 599, 601 (2d Cir. 1990). And when the Commission prohibited consideration of physique in 1991, courts continued to consider a defendant's extreme vulnerability to abuse in prison due to physical appearance and small size. In United States v. K., 160 F.Supp.2d 421 (E.D.N.Y. 2001), the district court deferred sentencing to promote rehabilitation after identifying as a ground for downward departure the fact that the defendant was "extremely small-boned and feminine looking" and after having noted the documented relationship between small size and physical appearance to vulnerability to abuse in prison. Id. at 443-44, 446-47. In United States v. Meillier, 650 F.Supp.2d 887 (D. Minn. 2009), the district court imposed a below-guideline sentence of one day in prison in part because the defendant, mentally challenged, was a shy person and of small physical statute, and thus vulnerable and could not protect himself.

Honorable Dora L. Irizarry
May 10, 2013
Page 28 of 46

## DEPORTATION DESPITE CURRENT CASE LAW

The Court may consider, as the Supreme Court stated in Koon v. United States, 518 U.S. 81, 110 (1996), the collateral consequences of the conviction on Mr. Goodman. But in the post-Koon world, after Gall and Kimbrough, it is clear that a court may consider the impact of collateral consequences, and appropriately hand down a non-Guideline sentence.

A sentence should take into account other punishments. There is more to the concept of just punishment and deterrence of an individual than just the temporal and physical hardships and restraints of a sentence of the Court. There is the deprivation of liberty by incarceration in a prison, there is deprivation from incarceration in one's home or under supervision, all of which impose unwilling restrictions upon ordinary freedom of movement which all take for granted. A host of other penalties and burdens always attend criminal convictions which include loss of socioeconomic status, public esteem, public employment, career opportunities, diminution of civil rights and entitlements as well as countless humiliations and indignities associated with public opprobrium and deportation from the only country they have known. Just punishment requires assessment of these elements as well. See United States v. Mateo, 299 F.Supp.2d 201 (S.D.N.Y. 2004).

Mr. Goodman is a lawful permanent resident having spent 38 years of his life in the United States. He faces the possibility of deportation by removal. As a general rule, one's status as an alien is not sufficient to take the case out of the "heartland," and thus is not grounds for a downward departure. United States v. Restrepo, 999 F.2d 640, 644 (2d Cir. 1993). Restrepo held that deportability is not a reasonable basis for a downward departure from the Guidelines); see United States v. Wills, 476 F.3d 103, 107 (2d Cir. 2007) (reaffirming the principle of Restrepo). Because alienage is a characteristic shared by a large number of people, it is not "ordinarily relevant" in making a departure determination. Restrepo, 999 F.2d at 643-44. Departures unlike visa are issued under a legally set number which has often been a congressionally enacted form of discrimination. Departures are available for facts presented and the fact that many are eligible but few are chosen is not the basis for individualized sentencing. Restrepo also held that downward departure is not capable of

Honorable Dora L. Irizarry
May 10, 2013
Page 29 of 46

remedying the problems caused by deportation for two reasons. First, departure does not ease the burden of deportation but only advances the day when it will occur. Restrepo at 647, and this the Court believed only exacerbate rather than remedy the harshness of deportation. The logical flaw in this argument is patent. Departures are not designed to remedy the effect of collateral consequence but are an offset to those consequence in the only place a court may make such an offset, the length of confinement.[13] Secondly, the Court determined that a defendant who moves for a downward departure would appear to prefer deportation to the alternative of prison time and therefore, cannot logically argue that deportation is the worst of the two alternatives. Id. Such reasoning ignores the fact that waiting for the deportation axe to fall causes its own agony. Further even if one is deported, it is unreasonable for a court to assume that a defendant, in order to show that he is eligible for a departure on the basis of the effects of deportation, must of necessity, never ask for it because it shows that he really wants it. He can only get the departure if he does not ask. This is nothing more than playing the "logic" card at the cost of defendant's lives. It is a false dichotomy. A Catch 22.[14]

Nonetheless, alienage may be considered as a basis for a downward departure where the effect is extraordinary in nature or degree. Restrepo permits a departure when some factor of alienage when the fact of deportation demonstrates a unique factor. Restrepo then proceeded to reject every factor that

---

[13] Courts cannot interfere with the Bureau of Prison rules or regulations authorized by Congress. Restrepo at 645; United States v. Duque, 256 Fed. App'x 436, 438 (2d Cir. 2007) (While it is true that "pertinent collateral consequences of a defendant's alienage" might serve as a valid basis for departure "if those consequences were extraordinary in nature or degree [,]" Restrepo, 999 F.2d at 644, the collateral effects at issue here are run of the mill).

[14] Heller, Joseph, Catch 22, Simon & Schuster 1961 at p. 56:

There was only one catch and that was Catch-22, which specified that a concern for one's safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he were sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to.

Honorable Dora L. Irizarry
May 10, 2013
Page 30 of 46

deportation entails.  But see United States v. Simalavong, 924
F.Supp. 610 (D. Vt. 1995).  The Court in Simalavong gave the
defendants a departure downward on the basis that a defendant
sentenced in neither Zone A nor Zone B could not receive the
sentence of probation that the District Court determined to be
not greater than necessary, due to the way the law treats non-
citizens by prohibiting certain sentences for aliens under Zone
C sentences.  To get to the correct and proper sentence, the
Court found that the bar of probation to resident aliens was an
extraordinary factor that justified departure to a Zone B
sentence.

        In Willis, 476 F.3d 103 (2d Cir. 2007), the Second
Circuit vacated the sentence imposed by the district court
because it relied on the likelihood of the defendant's
deportation in sentencing him. Deportation should only be
considered in sentencing in special circumstances, namely, "when
[the judge] identified, with some particularity, why a specific
defendant is certain to be deported and why deportation, in
light of that defendant's individual circumstances, will serve
to protect the public." Id. at 109. Therefore, Willis not only
disfavors lenient sentences to ameliorate deportation, it seeks
to invoke deportation as protective of the public and thus
permits a departure.

        This reading is in the face of the clear statutory
mandate that the sentencing court consider the history and
characteristics of the defendant.  The fact of alienage unlike
many sentencing issues is both a history of the defendant i.e.
where he came from and where he may go and a characteristic,
alienage being a classification under equal protection legally
considered as such things as race, gender, and other
characteristics of a class of persons subject to a certain
amount of legal protection under law. Given the statutory text
and the purposes of sentencing the decision in Willis following
Restrepo is intellectually questionable. See also United States
v. Loaiza-Sanchez, 622 F.2d 939, 942 (8th Cir. 2010) (aggravating
factor of alienage).  Adding to the doubt of the viability is
the decision in Padilla v. Kentucky, 559 U.S. 356 (2010), which
made deportation consequences a mandatory element of the right
to advise of effective counsel.

        The statutory purposes of sentencing are to promote
respect for the law, provide just punishment for the offense,
achieve general deterrence, and protect the public from further

Honorable Dora L. Irizarry
May 10, 2013
Page 31 of 46

crimes by the defendant. U.S.S.G., ch. 5, Pt. B, intro. comment.
These purposes are not impinged by the granting of a downward
departure in this case. The Willis Court stated that the
defendant could still illegally reenter, or commit border
violence or drug trafficking. Willis at 108. To that extent,
the Willis decision, reflecting that deportation is not an
element of consideration of the need to incapacitate the
defendant, is a false equivalency. If there is a need to
incapacitate the defendant to protect others, the fact that he
might commit further crimes punishes a defendant for what he or
she might do. It would seem that Willis stands in the face of
the rule that we punish for individual's actual crimes and not
for mere thoughts, especially when the thoughts are those, not
of the defendant but, of the Second Circuit judges.

        Deportation is considered by the courts as civil in
nature and not additional punishment on the basis that
deportation is a civil remedy for the alien's failure to perform
the conditions that allow continued residence in this county.
See Fung Yue Ting v. United States, 149 U.S. 698, 630 (1893).
The Court stated that while it may be harsh in practice, it is
not punishment. Apart from the fact that the case arose in the
context of fairly vicious racial exclusion policies in the
1890s, and apart from the fact that the same language has been
repeatedly invoked, it is now a completely different process
than the quick departure of the 1890s.[15]  The insistence that
deportation is civil in nature and not criminal punishment,
recently repeated by Willis is a relic of a system that no
longer exists. First, a person to be deported is held in
detention, similar to a defendant who is held in pretrial
detention, except that a criminal defendant can get a prompt
bail hearing, and a pretrial detainee gets credit for the
detention against his final sentence. The deportation detention
is under far worse conditions than a convicted prisoner.
Without mandatory rights to counsel, with no constitutional
protections, the system is a warehouse of humans maintained in

---

[15]   Such anti-immigrant cases have their roots in earlier, now
much-maligned decisions such as Chae Chan Ping v. United States,
130 U.S. 581, (1889), often titled the "Chinese Exclusion Case,"
which were openly racist and xenophobic in nature. Gerald M.
Neuman, Strangers to the Constitution 19-40 (1997), (history of
early immigration law including explicit race-based exclusion).
See also Id. at 119-36, 188-89 (criticizing the lack of
constitutional protection for aliens).

Honorable Dora L. Irizarry
May 10, 2013
Page 32 of 46

local facilities or contracted private jails. Immigration
detention deprives people of the ability to work to earn income,
and attend school in order to get a GED, as recommended for Mr.
Goodman by Probation. It sunders the human relationships in the
same way that is the byproduct of incarcerating convicted
criminals in prison. The aggressive enforcement and deportation
of aliens, criminal an otherwise has expanded the use of county
jails and private prisoners who have no incentive to spend the
requisite public money in the case of localities or private
profits in the case of the private prison industry in order to
house people humanely. Conditions in such places are often
blighted. Overcrowding, the lack of telephone access,
visitation, ventilation, clean quarters, safe food and
functioning toilets and showers are common. Inadequate health
care has been a persistent problem. Over one hundred immigration
detainees have died in immigration custody often due to neglect
of medical needs. The system intensifies the trauma by
repeatedly transferring detainees from place to place without
notice and for reasons that result in the constant influx of
prisoners and failures of management. The transfers destroy
relationships with family and lawyers representing the
detainees. The inability to find or be found in the immigration
system leads to detainees' cases being put off or abandoned by
them when the interminable wait to be heard saps the very hope
of a hearing. Repeatedly the system has deported American
citizens. See Finnigan, William; *The Deportation Machine*, *The
New Yorker*, April 29, 2013. The only difference between
incarcerations as a convicted criminal, from that of an alien
detainee, is that an incarcerated prisoner has more civil rights
because alien detainees are often held in localities or contract
private prisons. There is no recourse for relief. See
generally Kalhan, A. *Rethinking Immigration Detention*, 110
Columbia L Rev Sidebar 42-58 (2010). The circumstances of
detention of deportable aliens have been conceded to be
inappropriate for non-criminal purposes by Department of
Homeland Security personnel under whose aegis ICE runs the
deportation program. See Schriro, Dora; *U.S. Dpt. Of Homeland
Security, Immigration Detention Overview and Recommendations 10,
15* (2009). http://www.ice.gov/doclib/about/offices/odpp/pdf/ice-
detention-rpt.pdf last visited April 28, 2013.[16]

---

[16] Dr. Schriro is the former director of the Office of
Detention Policy and Planning of the Department of Homeland
Security.

Honorable Dora L. Irizarry
May 10, 2013
Page 33 of 46

As the District Court wrote in Beharry v. Reno, 183
F.Supp.2d 584, 590 (E.D.N.Y. 2002) rev'd on other grounds
Beharry v. Ashcroft, 329 F.3d 51 (2d Cir. 2003) it "defies
common experience to characterize deportation as anything other
than punishment for crimes". The Supreme Court has recognized on
more than one occasion that "deportation may result in the loss
'of all that makes life worth living'." Bridges v. Wilson, 326
U.S. 135, 147 (1945), citing Ng Fung Ho v. White, 259 U.S. 276,
284, (1922). The Bridges Court stated that the impact of
deportation upon the life of an alien is often as great, if not
greater, than the imposition of a criminal sentence.

A deported alien may lose his family, his friends and
his livelihood forever. Return to his native land may result in
poverty, persecution and even death. Bridges, 326 U.S. at 164.
For Mr. Goodman, deportation presents all those outcomes. He
will be kicked out of the country that has become his home and
is fundamentally the only country he has ever known. He will
lose direct personal and physical contact with his children and
will be forced to return to a place that, in effect, he has
never lived except for the years up to five years of age and of
which he has no memory. In this instance, the deportation is
not in conflict with the need for incapacitation, which is only
one of the goals of sentencing under 18 U.S.C. §3553. While the
process of deportation may be civil in nature, given process
that is due is far less, it is sheer fiction to believe that the
deportation system is civil when it has each and all of the
attributes of criminal incarceration. Willis represents a set
of blinders likely occasioned by a failure to develop a record
by the litigants before the lower court. Thus the crabbed
reading shoved forward by Willis, 476 F.3d at 107-108, to
prevent the Court even from providing a variance, is an
inappropriate bar to a reasonable sentence given that the issue
of a departure, on the basis of the incipient deportation, is
not that Mr. Goodman's need to be incapacitated after five years
of freedom after the original crime, and three years after he
confessed his crime, is minimal but the deleterious effects of
deportation are a reason for a departure. Further with the
exception of immigration crimes, U.S.S.G. 2 L1.2 comment n. 8,
there is no evidence that the Sentencing Commission actually
took into consideration the effect of deportation in determining
the Guidelines. A person like Mr. Goodman, a lawful permanent
resident, at his sentencing will have something taken away from
him that is not being taken away from an otherwise identical
citizen, namely his already earned privilege of being in the

Honorable Dora L. Irizarry
May 10, 2013
Page 34 of 46

United States and the ability to return to his family and his
community at the end of his prison term.   In this very real
sense, the Court must deicide and it is urged, to find that as
to Mr. Goodman, this sentence will consequently be greater than
necessary.

        Mr. Goodman is eligible for a departure, or at
minimum, a variance, because his situation is unique enough to
be outside the heartland.   Mr. Goodman has been in the United
States from the age of five. He has no memory of Barbados.   He
has been living under threat of violence from the Bourne
operation in this country, and has been told that he will be
killed for ratting out Bourne and others.   His return to
Barbados will increase the likelihood of his being harmed or
killed given the lawless in the Barbados is such that he cannot
be protected as he would be in the United States.   Bourne's
operation required an extensive network in the Barbados, not one
of which member has been caught or prosecuted.   Thus the Bourne
network may be intact and as eager for revenge as they were for
money.   Mr. Goodman's mother and his daughters and their mothers
are all here in the United States.   He would be unable to return
here without violating the law which means that he loses his
family, his social network, and is returned to a place with no
friends and no family.   At the sentencing, given the rules of
confinement imposed by the BOP, if the Court gives him a
sentence of incarceration then he will get a qualitatively
adverse sentence than he would receive as a citizen.   See
Simalavong, supra. at 613 (When a Canadian citizen would
necessarily be given a non-incarceratory sentence in the Court's
discretion, but cannot be afforded one solely because of his or
her alien status, this is outside the "heartland" and warrants a
downward departure pursuant to § 5K2.0.)   Fundamentally, where a
court finds that the fact of alienage and the consequence of
deportation threatens to change the nature of the entire
sentence, then the Court may depart even where the issue is the
type of confinement because a court must consider the kinds of
sentence that are available.   18 U.S.C. §3553(a) (3).   See
United States v. Bakeas, 987 F.Supp. 44 (D Mass 1997)
(functional equivalent of U.S. citizens sentence).

        While Mr. Goodman pleaded guilty to an aggravated
felony, which would cause his deportation, it is possible that
he can be determined not to be deportable on the basis of the
credible fact that his return to Barbados would likely cause his
death from the Bourne network.   Bourne more than once made it

Honorable Dora L. Irizarry
May 10, 2013
Page 35 of 46

clear to Goodman and others that to cross would ensure his death
here or at home, meaning Barbados.  As such, he is eligible for
obtaining an S-1 Visa.[17]  His eligibility for an S-1 Visa makes
it clear that the usual Second Circuit theory that no departure
should  be  given  for  deportation  consequences  because
imprisonment delays deportation, does not automatically apply to
Mr. Goodman.   Of course, if he applies for an S-1 Visa and is
shuttled from one immigration detention center to another, his
ability to fight for his S-1 Visa will be sapped.   See Kalhan,
Id.

## GOODMAN'S CASE IS SO SIMILAR TO GALL SO AS TO
## JUSTIFY A SENTENCE OF PROBATION AS REASONABLE

In Gall v. United States, 552 U.S. 38, 50 n.6, 56-60
(2007), the Court stated that 18 U.S.C. §3553(a) (1) is a "broad
command to consider . . . the history and characteristics of the
defendant". The Gall Court approved variance from the Guidelines
sentence based on factors the policy statements deem "not" or
"not ordinarily relevant" for departure.   In Pepper v. United
States, 131 S.Ct. 1229 (2011), the Court stated that judges were
free to disagree with policy statements particularly when they
"rest on wholly unconvincing policy rationales not reflected in
the sentencing statutes Congress enacted".

The  facts  in  Gall  are  substantially  similar  to the
case of Mr. Goodman.   Mr. Gall received a sentence of probation
on a drug case.    Gall joined an Ecstasy conspiracy for seven
months netting over $30,000 on his sales to customers,  as
opposed to the $5,400 that Mr. Goodman received.  The District
Court,  after  hearing  the  government's  argument  that  the
Guidelines are the appropriate sentence, instead provided Mr.
Gall with a variance and sentenced Gall to probation.    The
appellate  court  vacated  the  District  Court's  sentence  even
though it found the same facts:  "the defendant's voluntary and
explicit withdrawal from the conspiracy in September of 2000;
the defendant's exemplary behavior while on bond; the support
manifested by family and friends who have attested to the
defendant's character; the lack of criminal history, especially

---

[17]    See 8 U.S.C. §1101(a)(15)(S) (defining the "S" nonimmigrant
classification),  8  U.S.C.  §1182(d)  (waiver  of  grounds  for
exclusion),  8  U.S.C.  §1184  (numerical  limits,  period  and
conditions of admission, and reports to Congress), and 8 U.S.C.
§1255 (adjustment of status).

Honorable Dora L. Irizarry
May 10, 2013
Page 36 of 46

a complete lack of any violent criminal history; and the
immaturity of the defendant," 446 F.3d at 887. The Supreme
Court was most impressed with Gall's voluntary withdrawal. It
stated that virtually no conspiracy defendants voluntarily
withdraw; Gall did, and did so years before he even knew he was
the target of a federal investigation. In the Court's eyes,
this was a sign of genuine rehabilitation:

> Compared to a case where the offender's
> rehabilitation occurred after he was charged with a
> crime, the District Court here had greater
> justification for believing Gall's turnaround was
> genuine, as distinct from a transparent attempt to
> build a mitigation case.

Mr. Goodman withdrew from the Bourne conspiracy of his
own accord. Mr. Goodman acted prior to being discovered or
arrested. This self-rehabilitation speaks to his present
purposes and tendencies and significantly suggests that his own
restraint and discipline mitigates the need to impose further
restraint and disciple on him. See Pepper v. United States, 562
U.S. ___; 131 S.Ct 1229 (2011). Mr. Goodman thereafter returned
to his basic law abiding life and avoided Bourne and the
criminal activities. He maintained a substantial work history
until, as part of the plea agreement, he had to resign from the
airline. Further, the government will likely acknowledge that
Mr. Goodman's personality is like Gall's in that he is a pure
follower and frightened of his own shadow. To that end, he is
immature in the same sense that Gall was. Mr. Goodman has had
no significant criminal history, and the history that he does
have, is petty offenses and mistakes. None of his matters and
not a shred of evidence indicate any violence in his life. He
was not a leader, organizer or manager of the drug operation.
He was not engaged in the use of weapons. Unlike Gall, he was
not addicted to drugs. Mr. Goodman is as good a candidate for
probation as a sentence as Gall was. As the Court wrote in
Gall, 552 U.S. at 59, self-motivated rehabilitation lends strong
support to the conclusion that imprisonment was not necessary to
deter Gall from engaging in future criminal conduct. Given the
voluntary withdrawal and the self-motivated rehabilitation of
Mr. Goodman by foregoing further criminal conduct and by
remaining gainfully employed, no purpose would be served by
denying his a sentence of probation.

Honorable Dora L. Irizarry
May 10, 2013
Page 37 of 46

        It appears that there was no effort even to consider
probation in the case of Mr. Goodman.  The elements of the Gall
and Pepper cases reflected in the history and characteristics of
Mr. Goodman, were not considered in making the recommendation as
to a sentence no greater than necessary to comply with 3553(a)
(2)'s purposes. The District Court in Gall characterized the
sentence of probation not as an act of leniency, but as a
substantial restriction of his freedom and reminded Gall that he
faced harsh consequences should he violate any of the terms of
his probationary sentence.  This Court should similarly do so
with Mr. Goodman primarily because probation is a distinct.
sentence with independent value in the overall sentencing
scheme.  Gall, supra, 28 U.S.C. §994(k), 18 U.S.C. §3582 (a).

## A NON-GUIDELINE SENTENCE IS APPROPRIATE FOR MR. GOODMAN

        Mr. Goodman's history and characteristics justify a
variance.   The existence of "the history and characteristics of
the defendant" is a cornerstone of the sentencing factors.   It
means that a life well-lived counts.  Evil things done register
more vividly in the mind than the great mass of dull good deeds.
The focus on the bad acts in this process and the emphasis upon
them in punishment causes a loss of proportion.  What fades into
the background of a life is what should be foremost, and a
criminal sentence should reflect the entirety of that life
lived.

## OTHER FACTORS FOR THE COURT TO CONSIDER

        The nine Guideline factors listed in 18 U.S.C. §3553
(a) coupled with the parsimony clause suggest a more appropriate
and individualized sentence for Mr. Goodman.   A defendant's
reasonable sentence, under Booker's remedial scheme, imposes a
duty to impose "a sentence sufficient, but not greater than
necessary, to comply with sentencing purposes."  The parsimony
clause is the moral counter weight to punishment for the sake of
punishment.   It calls into question the Guideline severity and
seeks to ameliorate it.

        Title 18 U.S.C. §3553 (a) provides that the court
shall  impose  a  sentence  sufficient,  but  not  greater  than
necessary, to comply with the purposes set forth in paragraph
(2) of this subsection.  The factors listed in 18 U.S.C. §3553
(a), now in light of Gall, have greater vitality and equality.
The factors are found in the statute:

Honorable Dora L. Irizarry
May 10, 2013
Page 38 of 46

> (1) the nature and circumstances of the offense and
> the history and characteristics of the defendant;
> (2) the need for the sentence imposed - (A) to
> reflect the seriousness of the offense, to promote
> respect for the law, and to provide just punishment
> for the offense; (B) to afford adequate deterrence
> to criminal conduct; (C) to protect the public from
> further crimes of the defendant; and (D) to provide
> the defendant with needed educational or vocational
> training, medical care, or other correctional
> treatment in the most effective manner; (3) the
> kinds of sentences available; (4) the kinds of
> sentence and the sentencing range established for -
> (A) the applicable category of offense committed by
> the applicable category of defendant as set forth in
> the guidelines ...; (5) any pertinent policy
> statement ... [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence
> disparities among defendants with similar records
> who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims
> of the offense.

18 U.S.C. §3553(a).

The "purposes set forth in paragraph (2)" are the need
for the sentence to: reflect the seriousness of the offense,
promote respect for the law, provide just punishment, afford
adequate deterrence, protect the public from further crimes of
the defendant, and to provide the defendant with needed
educational or vocational training, medical care, or other
treatment in the most effective manner. The Court may also look
at the sentences of other defendants in the same case.

## THE SERIOUSNESS OF THE OFFENSE AND RESPECT FOR LAW

There is no doubt that the offense committed is
serious. Respect for law and the appreciation of a punishment
calibrated to the seriousness of the offense travel hand in
hand. However, in order to demonstrate the seriousness of the
offense or respect for law, the imposition of a jail sentence is
not the sole method for expressing social values of disapproval
for criminal behavior. Restriction upon freedom constitutes
punishment. In light of the application by the Government in

Honorable Dora L. Irizarry
May 10, 2013
Page 39 of 46

this matter, it appears that the Court can hand down a non-incarcerative sentence, and yet still demonstrate the seriousness of the offense and the respect for law.

### Adequate Deterrence

In considering the 3553(a) issues prosecutors and courts often focus properly upon the need for general deterrence, as embodied in 3553(a) (2) (a) and (b). In the discussion of general deterrence in this case certain things leap out.

Respect for the law is promoted by punishments that are fair, however, not those that simply punish for punishment's sake. United States v. Cernik, No. 07-20215, 2008 U.S. Dist. LEXIS 56462, at *25 (E.D. Mich. July 25, 2008) ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." (citing Gall, 128 S.Ct. at 599)). There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly, any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment, receives a slap on the wrist.

Given that it is clearly certainty of punishment not severity, it is unnecessary to provide general deterrence or specific deterrence to Mr. Goodman and others by jailing him. In the Sentencing Reform Act Congress directed the Sentencing Commission to insure that the Guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise "serious" offense. 28 U.S.C. §994(j). The Commission's response was to redefine "serious offense" in a way that was inconsistent with the prior practice upon which Congress relied and not at all based upon real data or analysis so as to increase the incarceration rate for non-violent first offenders above the pre Guidelines range. See United States v. Germosen, 473 F.Supp.2d 221, 227 (D Mass. 2007).

Honorable Dora L. Irizarry
May 10, 2013
Page 40 of 46

### The Parsimony Clause

The duty to impose a sentence sufficient, but not greater than necessary, to comply with sentencing purposes, is a finely nuanced discrimination and determination about which little useful guidance has been provided.  In <u>United States v. Ministro-Tapia</u>, 470 F.3d 137 (2d Cir. 2006), the Second Circuit found that "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of 3553 (a), it could not, consistent with the parsimony clause, impose the higher."  Conceptually, at least, <u>Ministro-Tapia</u> may be read as a directive to sentencing courts in the Second Circuit to impose the shortest sentence necessary to achieve the sentencing goals set forth in 18 U.S.C. §3553(a).

But this remains of little practical use.

The parsimony concept in penal theory and the philosophy of punishment is a concept of distribution of punishment so as not to maximize pain.  It is a principle that mandates the taking of care when punishment is distributed to avoid excesses in punishment. Jeremy Bentham articulated a "parsimony principle" which stated that any punishment greater than is required to achieve its end is unjust.  It is from Bentham that our law has derived the requirements of individualized punishment which is the hallmark of parsimony. Bentham believed that true parsimony required punishment to take into consideration the sensibility of the individual and thus an individual more sensitive to punishment should be given a proportionately lesser one, in order that what would be needless pain for that individual would be avoided and yet punishment would be appropriately imposed.  While in ordinary cases, due to the impracticality of determining each alleged criminal's relative sensitivity to specific punishments, this highly nuanced determination has been abandoned, it remains in our law in such areas of forbidding of the execution of the insane for whom the punishment would have no meaning.  <u>See</u> Ford v. <u>Wainwright</u>, 477 U.S. 399 (1986).  However, the principle retains its own vitality in terms of the command for individualization of sentences.  The Supreme Court wrote in <u>Koon</u> the basis of sentencing under the Guidelines is fundamentally the same assessment delegated to the judiciary from the very first moment man moved from mob justice inside into rooms with the signs and symbols of rationality:

Honorable Dora L. Irizarry
May 10, 2013
Page 41 of 46

> This too must be remembered, however. It has been
> uniform and constant in the federal judicial
> tradition for the sentencing judge to consider every
> convicted person as an individual and every case as
> a unique study in human failings that sometimes
> mitigate, sometimes magnify, the crime and the
> punishment to ensue. We do not understand it to have
> been the Congressional purpose to withdraw all
> sentencing discretion from the United States
> District Judge. Discretion is reserved with in the
> Sentencing Guidelines and reflected by the standards
> of appellate review adopt[ed].

Koon, Id.

In a day when, as United Supreme Court Justice Anthony
Kennedy put it, "our resources are misspent, our punishments too
severe, our sentences too long," the idea of a sentence that is
no longer than necessary is a remarkable consideration.

In the case of Mr. Goodman, the parsimony clause plays
a more focused role. It is a means of ameliorating the
inflexibility of the starting point of a sentence keyed to the
amount of drugs. It takes strength form the Court's decisions
in Gall, Kimbrough and Pepper. Parsimony suggests that a
sentencing court consider what degree of punishment is
necessary. A non-Guidelines sentence is sufficient to satisfy
the purposes of punishment. Courts may impose such sentences
consistent with Ministro-Tapia, but need not do so. As
demonstrated by the instant presentation, this sentencing court
may properly use the parsimony clause as well as other
considerations to provide this defendant with a non-Guideline
sentence.

### How To Punish Mr. Goodman - Split Sentence

A sentence can be satisfied by a sentence of probation
or a split sentence, a short period of time of incarceration
such as a jail sentence of a day and five years' probation with
community service. Like any sentence which substantially
restricts freedom, a split sentence serves the same purposes of
punishment.

Honorable Dora L. Irizarry
May 10, 2013
Page 42 of 46

In the enacting of the original Sentencing Reform Act, one of Congress's chief complaints about sentencing before the guidelines was that the law was not "particularly flexible in providing the sentencing judge with a range of options," such that "a term of imprisonment may be imposed in some cases when it would not be if better alternatives were available," or a "a longer term than would ordinarily be appropriate simply because there were no available alternatives that served the purposes he sought to achieve with a long sentence." S. Rep. No. 98-225, at 50 (1983). In Congress's view, there was "too much reliance on terms of imprisonment when other types of sentences would serve the purposes of sentencing equally well without the degree of restriction on liberty that results from imprisonment." Id. at 59. Congress believed that a term of imprisonment was not "necessarily a more stringent sentence than a term of probation with restrictive conditions…" Id. at 55. Congress believed that larger fines, probation with conditions, and alternatives to all or part of a prison term such as community service or intermittent confinement should be used more often, Id. at 50, 59, and that it would be up to the judge to determine whether the purposes of sentencing would best be served by probation or imprisonment, Id. at 92, 119, except that imprisonment was not appropriate to achieve the purpose of rehabilitation. See 18 U.S.C. §3582(a). Congress thus authorized judges to impose probation for most offenses, i.e., any offense with a statutory maximum below 25 years unless expressly precluded for the offense, see 18 U.S.C. §3561(a).

The Court can exercise its powers to issue a variance and in reliance upon the Government 5K1 motion to sentence Mr. Goodman to a split sentence. A split sentence would still be punishment. The taste of jail of incarceration would serve one powerful purpose. After the taste of jail the fear of returning to a jail cell would be a second level, more intense deterrence against any behavior other than strict compliance. As Justice Stevens wrote in Gall about probation, "[Gall] will have to comply with strict reporting conditions along with a three-year regime of alcohol and drug testing. He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court. Of course, the Defendant always faces the harsh consequences that await him if he violates the conditions of hers probationary term." Id. at 125.

Honorable Dora L. Irizarry
May 10, 2013
Page 43 of 46

        The suggested sentence combines both the severity of a
period of custodial sentence and the severity of probation's
monitoring restrictive of liberty.  Justice Stevens, writing for
the majority in Gall, quoted the District Court on the
imposition of probation as a sentence.  The District Judge
reminded Gall that probation, rather than "an act of leniency,"
is a "substantial restriction of freedom." Id., at 99, 125.  In
the memorandum, he emphasized:

        [Gall] will have to comply with strict reporting
        conditions along with a three-year regime of alcohol
        and drug testing. He will not be able to change or
        make decisions about significant circumstances in
        his life, such as where to live or work, which are
        prized liberty interests, without first seeking
        authorization from his Probation Officer or,
        perhaps, even the Court. Of course, the Defendant
        always faces the harsh consequences that await him
        if he violates the conditions of his probationary
        term.

Id., at 125.

        The Gall Court wrote:

        We recognize that custodial sentences are
        qualitatively more severe than probationary
        sentences of equivalent terms. Offenders on
        probation are nonetheless subject to several
        standard conditions that substantially restrict
        their liberty. See United States v. Knights, 534
        U.S. 112, 119 (2001) ("Inherent in the very nature
        of probation is that probationers 'do not enjoy the
        absolute liberty to which every citizen is
        entitled'" (quoting Griffin v. Wisconsin, 483 U.S.
        868, 874 (1987)). Probationers may not leave the
        judicial district, move, or change jobs without
        notifying, and in some cases receiving permission
        from, their probation officer or the court. They
        must report regularly to their probation officer,
        permit unannounced visits to their homes, refrain
        from associating with any person convicted of a
        felony, and refrain from excessive drinking.
        U.S.S.G. § 5B1.3.  Most probationers are also

Honorable Dora L. Irizarry
May 10, 2013
Page 44 of 46

> subject to individual "special conditions" imposed
> by the court. Gall, for instance, may not patronize
> any establishment that derives more than 50% of its
> revenue from the sale of alcohol, and must submit to
> random drug tests as directed by his probation
> officer.

App. 109.

The Court also cited 1 N. Cohen, *The Law of Probation
and Parole* § 7:9 (2d ed. 1999) "[T]he probation or parole
conditions imposed on an individual can have a significant
impact on both that person and society....Often these conditions
comprehensively regulate significant facets of their day-to-day
lives....They may become subject to frequent searches by
government officials, as well as to mandatory counseling
sessions with a caseworker or psychotherapist".

Probation serves a number of purposes in this case. A
maximum sentence of five years of probation is enough time for
the Court to supervise Mr. Goodman, insure that he is gainfully
employed and police his behavior. Over the entire five years
lies the constant threat of imprisonment, a far more effective
deterrent than a jail sentence that can be done and finished.
In fact, for a defendant like Mr. Goodman, the fear of jail is
far more powerful a deterrent than the actual serving of the
time. What we are afraid of carries far more effect than the
actual experience. We cannot adapt to the fear but we can to
the situation of incarceration. Mr. Goodman has lived with the
fear of being jailed from the moment he sat with the ICE Agents
and they asked him questions. Despite that fear he immediately
cooperated. The fear now is present and real and will not
dissipate if it remains hanging over him as a sword of Damocles.

First it leaves Mr. Goodman in the community in which
his shame and guilt remain on public display. He moves through
the community under supervision and is the evidence of
consequences to acts and a symbol useful for actual general
deterrence instead of the vague hope that others will know of
the punishment from afar. To that end, it is not a benefit
alone but a sentence that is serious and carries with it a
public burden. He moves through his community as a bad example
and a reproach to himself and others.

Honorable Dora L. Irizarry
May 10, 2013
Page 45 of 46

Secondly, it leaves him within the jurisdiction of the Court. Supervision of Mr. Goodman will be for him as confining as a prison sentence, given that he has, except for Pre Trial supervision, he has operated without confinement or restriction.

It aids Mr. Goodman and the community by enlisting the aid of the Probation Department in needed vocational training to meet this new and unfamiliar condition in which he is without a job, livelihood or profession, but for seasonal and weather dependent work on a lobster fishing boat.

## CRAFTING A SENTENCE

In essence the crafting of a sentence is for the purpose of creating balance, first among the goals of sentencing and second between the offender and society.

But how does one create balance? Each of us hears conflicting and often inarticulate inner voices; one asserting that even the most contrite and reformed sinners must still pay some price for their sins, the other calling for mercy and forgiveness and asking us to empathize with the criminal. So it is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice." See Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 OHIO ST. J. CRIM. LAW 627, 627, 638 (2004).

A split sentence serves a number of purposes in this case. A taste of jail instills the appropriate shock and pain that incarceration causes. A sentence of five years of probation is enough time for the Court to supervise Mr. Goodman. Over the entire five years lies the constant threat of imprisonment, a far more effective deterrent that a jail sentence that can be done and finished. In fact, for a defendant like Mr. Goodman, the fear of jail is far more powerful a deterrent after the taste of jail.

It leaves him within the jurisdiction of the Court so that the Court can insure his rehabilitation continues and thrives. Supervision of Mr. Goodman will be for him as confining as the prison sentence.

It aids Mr. Goodman and the community by enlisting the aid of the Probation Department in needed vocational training to

Honorable Dora L. Irizarry
May 10, 2013
Page 46 of 46

meet this new and unfamiliar condition in which he is without a
job, livelihood or profession.

**CONCLUSION**

In the process of sentencing another human being, the
federal justice system and the persons who participate in it
share the opportunity to find the heart of a person, to weigh
and make judgments which are laden with authenticity and not
merely authority. The criteria also point to individuated
considerations: No one size fits all. The object of this
balancing process is to achieve not a perfect or a mechanical
sentence, but a condign one -- one that is decent, appropriate
and deserved under all attendant circumstances.

While perhaps not as dramatic a rebound as that of the
college student Gall, Mr. Goodman's turnaround is one deserving
of probation and has proven from the day of his arrest, to the
day of his sentencing that he has been, and has continued to
rehabilitate himself. The offense of cocaine importation is
serious. The defendant's character nevertheless appears to be
good, and he has demonstrated a concerted effort to reform.
Since the defendant's last illegal conduct in 2005, he has made
great strides to better himself and provide for himself. The
defendant is again employed leading a useful life, paying child
support. Probation allows him to continue to rehabilitate
himself and support two families. Incarceration will only set
back all that he has accomplished for no valuable social
purpose. General deterrence is not achieved by punishment for
the sake of punishment. Here, redemption is the message for the
public at large, not jail. It is more important to reward good
works, given that there are fewer opportunities in the federal
criminal justice system to send that message along to the
society in which we live.

Respectfully yours,

DAVID L. LEWIS

DLL/bf
cc: Patricia Notopoulos (via email and regular US mail)
     Assistant United States Attorney
     Victoria M. Aguilar (via regular US mail)
     United States Probation Officer
     Hugh Goodman